Joseph N. Kravec, Jr., Esquire (*pro hac vice*)
STEMBER FEINSTEIN DOYLE
  PAYNE & CORDES, LLC
Allegheny Building, 17th Floor
429 Forbes Avenue
Pittsburgh, PA 15219
Telephone: (412) 281-8400
Facsimile: (412) 281-1007
Email: jkravec@stemberfeinstein.com

Michael D. Braun, Esquire (167416)
BRAUN LAW GROUP, P.C.
10680 West Pico Boulevard, Suite 280
Los Angeles, CA 90064
Telephone: (310) 836-6000
Facsimile: (310) 836-6010
Email: service@braunlawgroup.com

Janet Lindner Spielberg, Esquire (221926)
LAW OFFICE OF JANET LINDNER
  SPIELBERG
12400 Wilshire Boulevard, Suite 400
Los Angeles, CA 90025
Telephone: (310) 392-8801
Facsimile: (310) 278-5938
Email: jlspielberg@jlslp.com

J. Mark Moore, Esquire (180473)
Ira Spiro, Esquire (67641)
SPIRO MOSS LLP
11377 West Olympic Boulevard, Fifth Floor
Los Angeles, CA 90064-1683
Telephone: (310) 235-2468
Facsimile: (310) 235-2456
Email: mark@spiromoss.com;
ira@spiromoss.com

Wyatt A. Lison, Esquire
SPECTER SPECTER EVANS
  & MANOGUE, P.C.
The 26th Floor Koppers Building
Pittsburgh, PA 15219
Telephone: (412) 642-2300
Facsimile: (412) 642-2309
Email: wlison@ssem.com

***ATTORNEYS FOR PLAINTIFF***

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| JONATHAN C. KALTWASSER, on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> AT&T MOBILITY, LLC f/k/a CINGULAR WIRELESS LLC, <br><br> Defendant. | CASE NO.: 5:07-cv-00411-JF <br><br> **PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION [REDACTED]** <br><br> Judge: Honorable Jeremy Fogel <br> Date: June 11, 2010 <br> Time: 9:00 a.m. <br> Courtroom: 3 |

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................................1

II.     REPLY ARGUMENT ..........................................................................................................1

        A.      Plaintiff Has Article III Standing ..............................................................................1

        B.      Rule 23(a)'s Prerequisites Are Easily Satisfied ........................................................2

                1.      The Class Is Appropriately Defined and Sufficiently Numerous ......................2

                2.      Commonality Exists As Every Cingular Ad During The Class
                        Period Made The "Fewest Dropped Calls" Claim ............................................4

                3.      Typicality ..........................................................................................................5

                4.      Adequacy...........................................................................................................7

        C.      Predominance is Readily Established in this Case......................................................8

                1.      Professor Polinsky's Opinions and Cingular's Criticisms of
                        Plaintiff's Damage Model are Incompetent and Rely Solely
                        on Non-Existent Legal Standards......................................................................8

                2.      Defendant Ignores The Lessons of *Tobacco II*...........................................10

                3.      The Cases Cingular Relies On Are Inapposite, At Best ............................11

                4.      Breach of Contract Requires No Individualized Proof....................................15

                5.      Quasi-Contract/Unjust Enrichment Requires No Individualized Proof............17

        D.      A Class Action is the Sole Efficient Method for the Management of this Litigation...19

III.    CONCLUSION ..................................................................................................................20

1

# TABLE OF AUTHORITIES

2

3   <u>CASES</u>                                                                    PAGE NO.

4   *A&M Records, Inc. v. Heilman,*
5       75 Cal. App. 3d 554 (1978)........................................................................................10

6   *Ajaxo, Inc. v. E\*Trade Group, Inc.,*
7       37 Cal. Rptr. 3d 221 at 247-49 (2005) .....................................................................17

8   *American Airlines v. Wolens,*
        513 U.S. 219, 223 (1995)............................................................................................16

9
    *Barreras Ruiz v. Am. Tobacco Co.,*
10      180 F.R.D. 194 (D.P.R. 1998).....................................................................................19

11  *Cohen v. DIRECTV, Inc.,*
12      178 Cal. App. 4th 966 (2009).........................................................................3, 11, 12

13  *Daniel v. Am. Bd. of Emergency Med.,*
14      269 F. Supp. 2d 159 (W.D.N.Y. 2003) ......................................................................19

15  *Deitz v. Comcast Corp.,*
        2007 U.S. Dist. LEXIS 53188 (2007) ........................................................................18
16
    *Dukes v. Wal-Mart Stores, Inc.,*
17      __ F.3d __, 2010 U.S. App. LEXIS 8576, \*56 (9th Cir. Cal. Apr. 26, 2010) .................4, 5

18  *Endres v. Wells Fargo Bank,*
19      2009 WL 344204 (N.D. Cal. Feb. 6, 2008)................................................................14

20  *Foster Poultry Farms, Inc. v. SunTrust Bank,*
21      2010 U.S. App. LEXIS 8827 (9th Cir. Cal. Apr. 26, 2010).......................................16

22  *Hanlon v. Chrysler Corp.,*
23      150 F.3d 1011 (9th Cir.1998)........................................................................................4

24  *Hodes v. Van's Int'l Foods,*
        2009 WL 2424214 (C.D. Cal. July 23, 2009) ...........................................................14
25
    *In re Steroid Hormone Product Cases,*
26      181 Cal. App. 4th 145 (2010).....................................................................................12

27  *In re Tableware Antitrust Litigation,*
28      241 F.R.D. 644 (N.D. Cal. 2007)..................................................................................8

*In re Tobacco II Cases,*
    46 Cal. 4th 298 (2009) ..............................................1, 3, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15

*In re VIOXX Class Cases,*
    180 Cal. App. 4th 116 (2009)..................................................................................14

*Kaldenbach v. Mutual of Omaha Life Ins. Co.,*
    178 Cal. App. 4th 830 (2009)..................................................................................13

*Kanawai v. Bechtel Corp.,* 254 F.R.D. 102 (N.D. Cal. 2008)............................................7

*Korea Supply Co. v. Lock-heed Martin Corp.,*
    29 Cal.4th 1134 (2003) .............................................................................................9

*Kraus v. Trinity Management Services, Inc.,*
    23 Cal. 4th 116 (2000) ...........................................................................................10

*Laster v. AT&T Mobility, LLC,*
    2008 U.S. District LEXIS 103712 *42 (S.D. Cal. 2008)................................................20

*Laster v. AT&T Mobility, LLC,*
    584 F.3d 849 (9th Cir. 2009)......................................................................................7

*Local Joint Executive Bd. of Culinary/Bartenders Trust Fund v. Las Vegas Sands, Inc.*
    244 F.3d 1152 (9th Cir. 2001)..................................................................................20

*Lozano v. AT & T Wireless Services, Inc.,*
    504 F.3d 718 (9th Cir. 2007)....................................................................................16

*Mahfood v. QVC, Inc.,*
    2008 WL 5381088 (C.D. Cal. Sept. 22, 2008)............................................................14

*PAE Government Services, Inc. v. MPRI, Inc.,*
    514 F.3d 856 (9th Cir. 2007)....................................................................................18

*Park v. Cytodyne Technologies, Inc.,*
    2003 WL 21283814 (Cal. Sup. Ct., May 30, 2003).....................................................10

*People v. Outdoor Media Group,*
    13 Cal. App. 4th 1067 (1993)...................................................................................10

*Peterson v. Cellco Partnership,*
    164 Cal. App. 4th 1583 (Cal. App. 4th Dist. 2008) ................................................18, 19

*Pfizer, Inc. v. Superior Court,*
    182 Cal. App. 4th 622 (2010)..................................................................9, 12, 13, 15

*Sanchez v. Wal Mart Stores, Inc.*,
2009 WL 1514435 (E.D. Cal. May 28, 2009)...........................................................14, 15

*Sanders v. Apple, Inc.*,
672 F. Supp. 2d 978 (N.D. Cal. 2009) .................................................................................3

*Snepp v. United States*,
444 U.S. 507, 100 S. Ct. 763, 62 L. Ed. 2d 704 (1980) .................................................17

*Sorowitz v. Hilton Hotels Corp.*,
383 U.S. 363 (1963)...........................................................................................................7

*Valentino v. Carter-Wallace*,
97 F.3d 1227 (9th Cir. 1996).............................................................................................20

*Vathana v. EverBank*,
2010 U.S. Dist. LEXIS 35665 (N.D. Cal. Mar. 15, 2010) .................................................16

*Watson Laboratories Inc v. Rhone-Poulenc Rorer*,
2001 WL 1673258 (C.D. Cal. 2001) ..................................................................................17

*Westways World Travel, Inc. v. AMR Corp.*,
218 F.R.D. 223 (C.D. Cal. 2003) ....................................................................1, 6, 8, 16

*Williams v. Gerber Products Co.*,
552 F.3d 934 (9th Cir. 2008).............................................................................................11

*Yokoyama v. Midland Nat. Life Ins. Co.*,
594 F.3d 1087 (9th Cir. 2010) .....................................................................................16, 17

*Zinser v. Accufix Research Institute, Inc.*
253 F.3d 1180 (9th Cir. 2001) ...........................................................................................19

## STATUTES AND OTHER AUTHORITIES

Bus. & Prof. Code § 17203 ...............................................................................................15

Fed.R.Civ.P 8(d)(2)............................................................................................................18

Fed.R.Civ.P 8(d)(3)............................................................................................................18

Fed.R.Civ.P 23 ..................................................................................................................20

Fed.R.Civ.P 23(a)(2)............................................................................................................4

Fed.R.Civ.P 23(b)(3)....................................................................................................15, 20

## I.   INTRODUCTION

Cingular's entire brief is premised on the false notion that individualized proof of deception, reliance and injury from its misleading Fewest Dropped Call ads must be shown for each class member. No such showing is required for absent class members for any of the class claims asserted here. *In re Tobacco II Cases*, 46 Cal. 4th 298, 320, 328 (2009)(UCL/FAL); *Westways World Travel, Inc. v. AMR Corp.*, 218 F.R.D. 223, 238 (C.D. Cal. 2003)(breach of contract/unjust enrichment).

Indeed, it is only the representative Plaintiff of a UCL/FAL claim who must prove his individual reliance. *Tobacco II*, 46 Cal. 4th at 320, 328. Cingular's contentions that Plaintiff has not shown his reliance on Cingular's Fewest Dropped Calls ads are unsupportable. Indeed, Plaintiff testified consistently under several hours of questioning that he did rely and was injured as a result.

When Cingular's ill-conceived arguments based on non-existent reliance issues are removed, it is clear Cingular has no legitimate opposition to certification of Plaintiff's class based on Cingular's false and misleading Fewest Dropped Calls claim. Indeed, that claim was contained in every ad Cingular ran during the Class Period on which it spent [**REDACTED**] in California alone blanketing those ads in all forms of media as well as in all of its own stores and websites such that no class member could have realistically signed-up or renewed Cingular wireless service without being exposed to those ads. Thus, no valid reason exists to deny Plaintiff's Motion for Class Certification.

## II.   REPLY ARGUMENT

### A.   Plaintiff Has Article III Standing

Cingular's "Article III standing" argument rests on a single unsupportable contention that Plaintiff did not rely on Cingular's Fewest Dropped Calls ad campaign in deciding to renew his wireless service on July 31, 2006. Opp. at 6-8. As Cingular concedes, "reliance is proved by showing that the defendant's misrepresentation or nondisclosure was 'an immediate cause' of the plaintiff's injury producing conduct." *Tobacco II*, 46 Cal.4th at 326 (quotation citation omitted).

Plaintiff's deposition testimony clearly shows his reliance:

> Q.    So when your contract came up in the summer of 2006, did you consider switching providers at that time?
> A.    I did consider. I looked at the various different things out there. Yes, I had the aggravation of dropped calls, but at the same time based upon the advertising, if I

1    switched to a different network, I would actually have more dropped calls, and I don't
     want more dropped calls.  I want fewer dropped calls.

2           So, based upon the advertising I relied upon it to actually renew in July of

3    2006.  It wasn't until I actually switched to Verizon [in 2008] that I've had absolutely no
     dropped calls whatsoever.

4                                ● ● ● ●

5           Q.     And why did the fewest dropped calls ad influence your decision as
     opposed to other ads?

6           A.     Because actually being able to remain connected is important to me.  I
     looked at it as, okay, they've got the fewest dropped calls.  Dropped calls are annoying,

7    so I relied on the advertising to select why I renewed.

8    Kalt. Dep., pp. 74:14-75:5; 90:3-10.[1]  *See also* Kalt. Dec. ¶¶ 3-5 (numerous citations omitted).

9           Cingular tries to supplant Plaintiff's clear reliance testimony by creatively quoting from

10   Plaintiff's deposition.  When examined in context, none of the quotes demonstrate a lack of

11   standing.[2]  Plaintiff clearly relied on Cingular's ads and has standing.

12          **B.     Rule 23(a)'s Prerequisites Are Easily Satisfied**

13                  **1.     The Class Is Appropriately Defined and Sufficiently Numerous**

14          Cingular argues erroneously that Plaintiff's class is not ascertainable.    However, the class

15   definition is in fact precise and entirely objective and the members of the class are thus *ascertainable*.

16   No merits inquiries must be made to determine class membership, and Cingular can easily determine

17

18   _____

     [1]  All record evidence references herein are to the Declaration of Joseph N. Kravec, Jr. in Support of
19   Plaintiff's Motion for Class Certification filed at ECF 109 (unsealed portions) and ECF 118 and 122
     (sealed portions), unless otherwise indicated.
20   [2]  First, Cingular says Plaintiff is unsure if he would have renewed if he had not seen the ads, but
     Plaintiff testified that "knowing all the information I do about the different research that was
21   produced as part of this case, I have a different decision now." Kalt. Dep. at 75:16-19. Second,
     Cingular says Plaintiff is unsure when he formed the belief from Cingular's ads that "no other
22   wireless company had fewer dropped calls," but as Plaintiff explains in his Declaration he formed the
     belief based on the ads that Cingular had "the fewest dropped calls" before he renewed and is only
23   unsure when he first thought of it phrased as "no fewer dropped calls." Kalt. Dec. ¶¶ 7-8. Third,
     Cingular says Plaintiff is unsure when he made up his mind to renew or if he saw the ads before he
24   renewed, but Plaintiff testified multiple times he saw the fewest dropped calls ads before he renewed,
     that the fewest dropped call promise was the primary reason for his decision to renew, and that he
25   certainly made the decision to renew by the time he signed the renewal agreement at the Cingular
     store on July 31, 2006. Kalt. Dec. ¶ 10. Fourth, Cingular says being a Cingular customer since 2004
26   Plaintiff knew Cingular dropped calls before he renewed in 2006, but Plaintiff testified he believed
     Cingular's ads were not promising no dropped calls, but that it had "the fewest" and if he went to
27   another provider, he would have more. Kalt. Dep. at 92:2-12. Fifth, Cingular says Plaintiff did not
     take advantage of his 30-day right to cancel after renewal in July, 2006, but Plaintiff testified he did
28   not know Cingular had lied about its dropped call performance until September, 2006. Kalt. Dep. at
     163:18-164:10.
     **PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**
     **Case No.: 5:07-cv-00411-JF**

the class members by reference to its records. Cingular's real argument is not that the class definition is not sufficiently objective or precise, but rather that it is *overly broad*, because, it claims, some class members might not have relied on the Fewest Dropped Call ads in question. But, as discussed further below, such class member reliance is not required under any of the claims Plaintiff is seeking to have certified for class treatment.

Cingular cites *Sanders v. Apple, Inc.*, 672 F. Supp. 2d 978 (N.D. Cal. 2009). However, as this Court knows, that case involved fraud and breach of warranty claims in addition to a UCL claim; it involved no saturation marketing campaign like Cingular's pervasive Fewest Dropped Calls campaign; and it involved a plaintiff who expressly alleged that he purchased his Apple products not because of the disputed advertising but rather because of brand loyalty. Cingular says this Court held the class "was not ascertainable because it included persons who were not deceived by advertisements or suffered no damages and thus lacked damages" (Opp at 8:13-14), but it is not actually clear that the Court's holding rested on ascertainability, particularly since the class appeared to be ascertainable. Rather, in a brief section of the opinion with a *heading* stating "Whether The Class is Ascertainable," this Court concluded that the class was *overbroad* because it was defined as all persons in the United States who *owned* a 20-inch Aluminum iMAC. It appears to have been the fact that the class was defined as all *owners*, and thus "necessarily" included non-purchasers who lacked standing because they *couldn't* have relied on, or been damaged by, the alleged misrepresentations at issue, that led this Court to strike the class allegations (with leave to amend). 672 F. Supp. 2d at 991. Defendant, not surprisingly, omits that fact in purporting to quote the Court's "ascertainability" holding. Opp., p. 8:13-14.[3]

---

[3] Cingular also asserts that *Cohen v. DIRECTV, Inc.*, 178 Cal. App. 4th 966 (2009) found that a class seeking UCL relief "was not ascertainable when it includes people who never saw" the allegedly misleading advertisement. Opp., 8:16-18. *Cohen* is discussed further below. Setting aside that the *Cohen* court misinterpreted *Tobacco II*, as discussed below, Defendant is mischaracterizing *Cohen's* "ascertainability" holding. In fact, the *Cohen* court flatly rejected the trial court's holding that the class was not ascertainable, holding that it was ascertainable. *See Cohen, supra* at 975-78 (noting, *inter alia*, that the trial court had confused commonality and ascertainability and that "the defined class of all HD package subscribers is precise, with objective characteristics and transactional parameters, and can be determined by DIRECTV's own account records. No more is needed.")

PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION
Case No.: 5:07-cv-00411-JF

1    Here, Plaintiff's class definition does not include anyone who did not pay money to Cingular,

2    based, as alleged, at least in part on its Fewest Dropped Calls claims. Thus, it is not overbroad in the

3    sense that the class in *Sanders* was. Moreover, it bears noting that *Sanders* pre-dated *Tobacco II*,

4    which confirms that after Prop 64 absent class members in a UCL/FAL action (still) need <u>not</u> prove

5    reliance or injury to recover restitution of money that "may have been acquired" by means of the

6    unfair business practice. *Tobacco II*, 46 Cal. 4th at 320.

7    Finally, although its section *heading* (Opp., 8:10) references an absence of numerosity,

8    Cingular does not actually *argue* in its brief that the proposed California class is not sufficiently

9    numerous for class treatment. Any such argument would be absurd. The class consists of, at least,

10   hundreds of thousands of persons, and Cingular does not, and cannot truthfully, dispute this.

### 2. Commonality Exists As Every Cingular Ad During The Class Period Made The "Fewest Dropped Calls" Claim.

12   Rule 23(a)(2)'s commonality requirement is "minimal" and should be construed permissively.

13   *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019-20 (9th Cir.1998). "[W]hat must be satisfied for the

14   commonality inquiry under Rule 23(a)(2) is that plaintiffs establish common *questions* of law and

15   fact, and answering those questions is the purpose of the merits inquiry, which can be addressed at

16   trial and summary judgment." *Dukes v. Wal-Mart Stores, Inc.*, __ F.3d __, 2010 U.S. App. LEXIS

17   8576, *56 (9th Cir. Cal. Apr. 26, 2010). Importantly, "it is the plaintiff's *theory* that matters at the

18   class certification stage, not whether the theory will ultimately succeed on the merits." *Id.* at *34

19   (citations omitted).

20   Cingular does not, and cannot refute the numerous key questions of fact and law common to

21   all class members here specified in Pltf. Mem. at 14. As Plaintiff previously showed, these questions

22   can be answered through the use of common evidence. Pltf. Mem. at 4-11, 18-22.

23   Despite the common issues identified in Plaintiff's opening brief, Cingular contends

24   commonality is lacking because some of its ads allegedly varied to some degree. The argument lacks

25   merit, since the Fewest Dropped Calls claim was contained in all of Cingular's ads during the Class

26   Period, and Cingular has offered no evidence to the contrary. Likewise, Cingular's argument

27   regarding what individual class members saw or heard is premised on an incorrect understanding of

28   California law. Significantly, every putative class member here was exposed to the Cingular Fewest

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**
Case No.: 5:07-cv-00411-JF

Dropped Calls ads before renewing or initiating Cingular's wireless service. Indeed, Cingular spent [REDACTED] - in California - on the Fewest Dropped Calls ads and blanketed all forms of media (*i.e.,* television, print, billboards, etc.) with those ads as well as its website and in its stores, such that signing-up or renewing service without being exposed to the ads was not realistically possible. Pltf. Mem. at 4-5. Cingular has not shown otherwise.

Seeking to obfuscate the centrality and breadth of its Fewest Dropped Calls campaign, Cingular attacks commonality by claiming some ads contained *additional* language. Opp. at 9-10. But this is irrelevant since each ad also included the Fewest Dropped Calls claim. Cingular next relies on Plaintiff's testimony for the proposition that its ads were different. However, the ads have been produced and the Court can determine for itself as a matter of law if any differences are material under the objective reasonable consumer test. *Tobacco II*, 46 Cal. 4th at 327. Plaintiff's testimony is thus not relevant to this determination, but it is noteworthy that Plaintiff never said the "Fewest Dropped Calls" claim in the ads were substantively different. To the contrary, Plaintiff stated that all the ads were essentially the same. Kalt. Dep., pp. 149:21-150:3.

Moreover, any questions that may arise as to the competency of such evidence only support a finding of commonality here. *Dukes*, 2010 LEXIS 8576, *103 ("While Plaintiffs and Wal-Mart disagree on whose findings are more persuasive, the disagreement is not one whether Plaintiffs have asserted common questions of law or fact. The disagreement *is* the common question, and deciding which side has been more persuasive is an issue for the next phase of the litigation.")(internal quotations and citations omitted). Here, any disputed questions concerning whether the "Fewest Dropped Calls" tag-line was "likely to deceive" an ordinary consumer; whether the data used to support the assertion was reliable; and/or whether Cingular's Fewest Dropped Calls claim made in the State of California was supported, can be answered utilizing common evidence.

### 3. Typicality

Cingular's typicality argument is simply a laundry list of irrelevant differences between Plaintiff and class members. Most of them rest on Cingular's faulty notion that absent class members must show individualized reliance on Cingular's fewest dropped calls ads. Op. Br. at 10-13. *Cf. Tobacco II*, 46 Cal. 4th at 320 (proof of reliance for each absent class members is *not* required for a

UCL claim); *Westways World Travel,* 218 F.R.D. at 238 (reliance *not* an element of a breach of contract or unjust enrichment claim).  Others rest on Cingular's misconception that Plaintiff's and class members' dropped call experience and how that experience was affected by the type of phone used is relevant to the Class' claims.  The claims in this case are <u>not</u> about how many dropped calls any particular class member experienced, but instead are about whether Cingular's ad claim that it had the Fewest Dropped Calls was false and misleading and whether it was material to class members' decisions to renew or sign-up.  That can be determined by the trier of fact by examining Cingular's ads and the data it relied on for its claim, the materiality of which the Court will objectively determine based on a reasonable person standard.  *Tobacco II*, 46 Cal. 4th at 327 ("A misrepresentation is judged to be 'material' if 'a reasonable man would attach importance to its existence or nonexistence in determining a choice of action in the transaction....").

Cingular asserts Plaintiff is not typical of the Class because he saw Cingular's Fewest Dropped Calls ads while some class members may not have and that some of its ads contained different language.  Its arguments are irrelevant given the scope of its ad campaign and implausibility of any class member signing-up or renewing service without being exposed to those ads as detailed in the commonality discussion above.

Next, Cingular postulates that Plaintiff's interpretation of Cingular's ads is a-typical because a reasonable consumer would not understand Cingular ads to mean it had the Fewest Dropped Calls "everywhere in the nation."  What Plaintiff actually said was "I have to rely on what your actual statements were where were they had the fewest dropped calls . . . There was no other statement at the bottom that said, hey, we're actually Number 2 or 4 or whatever in California.  It just said fewest dropped calls." Kalt. Dep. at 91:4-13.  Cingular's own **[REDACTED]** showed consumers interpreted its ads to mean [ **REDACTED** ] Kravec Dec., Ex. 4 (CW-K-108416).  While reasonable consumer interpretations are for the Court to determine, Plaintiff's interpretation is certainly not a-typical.

Cingular's other alleged differences are likewise irrelevant.  That Plaintiff moved to Virginia after he signed up for Cingular's service in Monterey, California is irrelevant as the claim is about the misleading nature of Cingular's ads in consumer's decision to sign-up or renew Cingular services

which for Plaintiff occurred in California like all other class members.  That some class members had Cingular service and renewed and others were new customers creates no real difference as Cingular was claiming it had the fewest dropped calls based on independent data that was concealed from consumers.  Moreover, Plaintiff's conversations with Cingular's sales people could not have revealed the truth as that data was not disclosed to Cingular sales people.

Last, Cingular's original and revised arbitration clauses were rejected by this Court and affirmed by the Ninth Circuit in an appeal in this action (ECF 62 and 101) and in *Laster v. AT&T Mobility, LLC*, 584 F.3d 849 (9th Cir. 2009), as was any argument Cingular makes based on Plaintiff moving to Virginia after he renewed in California.  Cingular's Hail Mary attempt to seek *certiorari* to the United States Supreme Court of *Laster* is no reason to deny certification here.  Even if *Laster* were reversed, it would not apply to those persons like Plaintiff for whom the original arbitration clause applies so all that might be affected is the size of the class not whether there is a class. Cingular's remaining typicality arguments have been fully addressed in the Article III standing section above.

### 4.    Adequacy

Cingular presents no legitimate reason why Plaintiff is inadequate.  First, as shown in Arguments B.1 – B.3 above, Plaintiff did rely on Cingular's fewest dropped calls ads to renew and the falsity of Cingular's ads can be established by common evidence from Cingular's own data. Second, while a representative plaintiff may be inadequate if evidence shows he ceded control of the litigation to counsel so counsel is the "driving force,"  Cingular has presented no evidence whatsoever that Plaintiff has "cede[d] control of this litigation to counsel" or that his prior "relationship with Plaintiff's counsel" somehow means he will cede control.  Indeed, as detailed in Plaintiff's opening memorandum, Plaintiff understands the class claims brought, that he has a responsibility to do whatever he can to advance the interests of the Class, that he has spent "hundreds of hours" on the case, and that he wishes to represent the Class and he expects nothing more than what the Court deems appropriate for himself and all Class members.  Kalt. Dep. at 9:5-10:12, 20:20-21:5, 31:21-32:11, 52:12-53:22, 167:2-18.  This more than meets the adequacy standard.  *Kanawai v. Bechtel Corp.*, 254 F.R.D. 102, 110 (N.D. Cal. 2008), *citing Sorowitz v. Hilton Hotels Corp.*, 383

U.S. 363, 373 (1963) and *In re Tableware Antitrust Litigation*, 241 F.R.D. 644, 649-50 (N.D. Cal. 2007)(" . . . the representatives must have some familiarity with the litigation, although a detailed understanding of the theories and facts of the case is not required.").[4]

Cingular also muses that Plaintiff's damage model ignores "individual harm or experience" so he should be deemed inadequate because it might be unfair to some class members. In fact, as shown in Argument C. 1, Plaintiff's damage model seeks restitutionary disgorgement of Cingular's profits made on all Class members who initiated or renewed during Cingular's false and misleading Fewest Dropped Calls campaign. It has hard to conceive how this well-established form of relief would be unfair to any class members, let alone create such a degree of unfairness among class members as to make Plaintiff inadequate.[5]

## C.    Predominance is Readily Established in this Case

### 1.    Professor Polinsky's Opinions and Cingular's Criticisms of Plaintiff's Damage Model are Incompetent and Rely Solely on Non-Existent Legal Standards

Despite admitting he has no specialized or expert knowledge on liability issues, Professor Polinsky conceded at his deposition that all of his opinions concerning individualized proof for liability purposes are rendered irrelevant if class members are not required to prove individualized reliance. Kravec Suppl. Dec., Exh. 1 (Polinsky Dep. at 74:5-75:11; 96:9-24). As demonstrated in the following sections, absent class members are not required to prove individualized reliance under the UCL, nor is reliance an element of breach of contract or unjust enrichment claims. *Tobacco II*, 46 Cal. 4th at 320 (proof of absent class members' reliance *not* required under UCL); *Westways World*

---

[4]    Likewise, that Plaintiff did not know the source of a few documents out of the hundreds he produced in discovery does not make him inadequate as Cingular implies. Nor does the fact that he may have discarded some monthly billing statements Cingular sent to him after the litigation started since they have no bearing on whether Cingular's false and misleading ads were material to his decision to renew and Cingular has copies of those billing statements anyway. Moreover, Plaintiff provided all other documents to his counsel. Kalt. Dep. at 116:20-117:1. Lastly, Plaintiff does have the ability to take time off from his naval duties for this case and has done so for the 2 depositions Cingular has taken of him. Kalt. Dep. at 26:7-27:19. The hypothetical possibility that something different may happen in the future is no reason to find Plaintiff inadequate.
[5]    Cingular notes that Plaintiff did not move to certify his CLRA claim. But that claim seeks only injunctive relief that Plaintiff could obtain without class certification and which would provide the same benefit if the CLRA injunctive claim were certified. Thus, not seeking to certify that CLRA claim gives up nothing for the Class.

PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION
Case No.: 5:07-cv-00411-JF

1    *Travel,* 218 F.R.D. at 238 (reliance *not* an element of a breach of contract or unjust enrichment

2    claim).

3          Moreover, Professor Polinsky concedes that his criticisms from an economic perspective of

4    Dr. French's class-wide restitutionary disgorgement relief model would not apply if individualized

5    proof of harm or reliance on Cingular's fewest dropped calls ads did not need to be shown under the

6    law. Polinsky Dep. at 74:4-75:11; 96:9-24. In fact, Professor Polinsky agreed that Dr. French's

7    model for calculating Cingular's profit on class members' transactions for restitutionary

8    disgorgement was accurate. *Id.* at 102:17-103:3; 110:23-111:4. Professor Polinsky further conceded

9    that Dr. French's calculation of apportioning the [**REDACTED**] in the costs of the deceptive Fewest

10   Dropped Calls ads to class members was accurate if the Court determined that those costs should not

11   be recoverable. *Id.* at 107:8-108:15.

12         Cingular is incorrect in contending that restitutionary disgorgement of profits on affected

13   transactions is not an available remedy in absence of individualized proof of harm or reliance. To

14   support its incorrect notion, Cingular cites cases discussing "restitution" that requires individual proof

15   of harm rather than "restitutionary disgorgement" that does not. Op. Br., 16, 22-25.

16         As California Supreme Court clarified, restitutionary disgorgement of profits is an available

17   remedy under the UCL. *See Korea Supply Co. v. Lock-heed Martin Corp.*, 29 Cal.4th 1134, 1144

18   (2003)("Under the UCL, an individual may recover profits unfairly obtained to the extent that these

19   profits represent monies given to the defendant or benefits in which the plaintiff has an ownership

20   interest."). The Supreme Court further held that restitutionary disgorgement relief "under the UCL is

21   available without individualized proof of deception, reliance and injury." *Pfizer, Inc. v. Superior

22   Court*, 182 Cal. App. 4th 622, 631 (2010), *quoting Tobacco II*, 46 Cal. 4th at 320. Thus, as *Pfizer*

23   concluded, all that is left is showing class members were "exposed" to the deceptive advertising

24   (although a petition for review is pending and even that requirement may be reversed). *Id.*

25         Here, as shown in Argument B. 2 above, the scope of Cingular's Fewest Dropped Calls ad

26   campaign with [**REDACTED**] spent on it in California and with ads blanketing every form of media

27   as well as displayed in all Cingular stores and websites where consumers sign-up and renew wireless

28   service creates an implausibility of any class member signing-up or renewing service without being

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**
Case No.: 5:07-cv-00411-JF

1    exposed to those ads.  Cingular has offered no evidence to the contrary.  As discussed in detail in the

2    next section, the concern in *Pfizer* where Listerine bottles had 34 types of labels available at the same

3    time and only 19 of them had the misleading content so many people bought without receiving the

4    misleading label simply does not exist here where all of Cingular's advertising during the Class

5    Period had the uniform Fewest Dropped Calls claim and all class members would have had to be

6    exposed to them in order to sign-up or renew.  Thus, under *Tobacco II*, because "individualized proof

7    of deception, reliance and injury" is not required for absent class members, Dr. French's

8    restitutionary disgorgement model is a proper method of determining class-wide relief.  *Id.*

9         Moreover, it is also permissible for this Court to use its equitable powers to deny Cingular

10   credit for the [**REDACTED**] cost of the deceptive Fewest Dropped Call ads in accessing the amount

11   recoverable under restitutionary disgorgement.  *Park v. Cytodyne Technologies, Inc.*, 2003 WL

12   21283814 (Cal. Sup. Ct., May 30, 2003)("It would be inequitable to allow the defendant to reduce the

13   amount of restitution by the amount spent on the misleading advertisements" and the Court used its

14   equitable powers to disallow that reduction).[6]  Thus, Dr. French's alternative model not deducting

15   those advertising costs from revenues for purposes of ascertaining Cingular's profits to be disgorged

16   and instead apportioning them to class members is a viable class-wide relief model as well.

17            **2.     Defendant Ignores The Lessons of *Tobacco II***

18        Defendant's "predominance" argument is based largely on the proposition that to

19   establish UCL/FAL liability and a right to restitutionary relief on a class-wide basis, the Court

20   would have to make all sorts of individual inquiries focused on class members' actual

21   deception/harm, reliance, "damages," purchasing decisions, etc.   Defendant is wrong.  As the

22   California Supreme Court recently reaffirmed, *"the UCL's focus [is] on the defendant's*

23   *conduct, rather than the plaintiff's damages. . . ."  Tobacco II*, 46 Cal. 4th at 312 (Emphasis

24   added).  Its purpose is to restore the *status quo ante.  Kraus v. Trinity Management Services,*

25   *Inc.*, 23 Cal. 4th 116, 121 (2000).  Thus, restitutionary disgorgement "*may be ordered* 'without

26

27   ───────────────
     [6]  *See also People v. Outdoor Media Group*, 13 Cal. App. 4th 1067, 1073 (1993)("We decline to
28   allow credit for the expenses of conducting what was, in effect, an illegal business."); *A&M Records, Inc. v. Heilman*, 75 Cal. App. 3d 554, 570 (1978) (same).

1    individualized proof of *deception, reliance, and injury* if necessary to prevent the use or

2    employment of an unfair practice.'" (internal citations omitted)  *Tobacco II*, 46 Cal. 4th at 320

3    n.14.

4            *Tobacco II* confirms that reliance is merely something that *the class representative* must

5    establish in order to have *standing*, following Prop 64's imposition of a "standing"

6    requirement," in order to bring a UCL claim.  The *Tobacco II* Court was careful to qualify its

7    discussion of reliance as applicable *only* to the named class representatives and *only* for standing

8    purposes—*not* to the unnamed class members and not for purposes of liability at trial.  *Tobacco*

9    *II* at 306, 328, 329.  Thus, reliance is irrelevant to whether common questions predominate on

10   liability in a UCL case like this one since proof of individualized reliance, deception and injury

11   for *absent class members* is not required.    All that must be proven at trial to establish a

12   violation of the UCL's "fraudulent" prong is that "members of the public are likely to be

13   deceived" by the defendant's conduct.  *Id.* at 312; *see also Williams v. Gerber Products Co.*, 552

14   F.3d 934 (9th Cir. 2008). Again, **out of "concern that wrongdoers not retain the benefits of**

15   **their misconduct," recovery is "available without individualized proof of deception,**

16   **reliance, and injury."** *Tobacco II*, 46 Cal. 4th at 320.  The "focus [will be] on the defendant's

17   conduct," and therefore on what the *defendant gained*, "in service of the statute's larger purpose

18   of protecting the general public against unscrupulous business practices." *Tobacco II* at 298.

19              **3.    The Cases Cingular Relies On Are Inapposite, At Best**

20           Defendant relies heavily on *Cohen*, 178 Cal. App. 4th 966. *Cohen* badly misinterpreted

21   *Tobacco II*.  Although, under *Tobacco II*, "reliance" is not an element of a UCL claim, and although

22   *Tobacco II* holds that unnamed class members need not prove "reliance," *Cohen* nonetheless holds

23   that class certification may be defeated based on individualized questions surrounding unnamed class

24   members' "reliance." *See Cohen*, 178 Cal. App. 4th at 981 (unnamed class members' "reliance" was

25   "a proper criterion for the court's consideration when examining 'commonality'").  That holding is

26   contrary to *Tobacco II*, in which the Supreme Court expressly reinstated an order granting class

27   certification of a UCL "fraudulent" prong claim, holding that the lower courts *erred* by considering

28   individualized questions surrounding unnamed class members' reliance. 46 Cal.4th at 311, *passim*.

Indeed, the only post-*Cohen* appellate decision involving these issues that has even cited *Cohen* – a decision from a different division of the *same* Second District Court of Appeal - did so critically, in reversing the denial of class certification in a case alleging UCL and CLRA claims. *In re Steroid Hormone Product Cases*, 181 Cal. App. 4th 145, 158 (2010). *Cohen* simply misread *Tobacco II* and should not be followed.[7]

Cingular also seeks to rely on *Pfizer*, 182 Cal. App. 4th 622. That case also is inapposite. *Pfizer* involved marketing claims regarding the benefits of Listerine mouthwash and its ability to replace dental floss. The *Pfizer* court rejected Cingular's present argument that after *Tobacco II* absent class members must show reliance on allegedly misleading representations or advertising. *Pfizer*, 182 Cal. App. 4th at 631 (*citing Tobacco II*, 46 Cal. App. 4th at 320). However, the court found the class was "grossly overbroad" because "one who was not exposed to the alleged misrepresentations and therefore could not possibly have lost money or property as a result of the unfair competition is not entitled to restitution." *Id.* Defendant Pfizer offered *evidence* – lacking here – that 19 of the 34 different mouthwash bottles on the market did not even contain the challenged statements, and, based on that and other *evidence*, the Court found that "perhaps the majority of class members who purchased Listerine" during the class period did so not because of "any" exposure to the allegedly deceptive conduct. *Id.*, at 631-32. After distinguishing the pervasive marketing campaign in *Tobacco II*, the court repeated:

---

[7] *Cohen* also is distinguishable, as the *Steroid Hormone* court also observed at p. 158 of its opinion. *Cohen* involved claims that DIRECTV violated the UCL by inducing subscribers to buy high definition services through misleading advertising that its broadcast of those channels would meet certain technical specifications regarding bandwidth of transmission. Setting aside that the plaintiffs in *Cohen* sought nationwide certification and Plaintiff here does not, DIRECTV put on evidence (including declarations from subscribers) showing that many of them made purchases of the HD channels unrelated to the advertising of the technical specifications. *Cohen* at 970. *See also Steroid Hormone Product Cases* at 158. The appeals court found that "the record" supported the finding that the class included subscribers who "never saw DIRECTV advertisements or representations of any kind" before buying the HD services, and subscribers "who only saw and/or relied upon advertisements that contained no mention of technical terms regarding bandwidth or pixels . . . ." *Id.*, at 979. Cingular has offered no such *evidence*. Nor can it claim that representations about various technical bandwidth specifications are the same as its [REDACTED] saturation marketing campaign of the Fewest Dropped Calls claim. As shown by the evidence cited in Plaintiff's opening brief, Cingular's campaign expressly recognized the importance of its Fewest Dropped Calls claim to consumers. Pltf. Mem. at 4-5.

PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION
Case No.: 5:07-cv-00411-JF

"[L]arge numbers of class members were *never exposed* to the 'as effective as floss' labels or television commercials.   As to such consumers, there is absolutely no likelihood they were deceived by the alleged false or misleading advertising or promotional campaign.   Such persons cannot meet the standard of section 17203 of having money restored to them because it 'may be have been acquired by means of' the unfair the unfair practice.   In the language of section 17203, with respect to perhaps a majority of class members, there is no doubt Pfizer did not obtain any money by means of the alleged UCL violation."

*Id.,* at 632-33 (italics in original, underlining added).

Suffice it to say that Cingular has offered no such evidence here.   Instead, it merely speculates that there *may* be some people who did not *rely* on its fewest dropped calls campaign, even though its Fewest Dropped Calls ads were *everywhere* – on TV, on the radio, at all its stores, on its website, on billboards, and in virtually every single print ad during the period in question.   Pltf. Mem. at 4.   It certainly has not offered a shred of evidence even suggesting that any large portion of the class – let alone a *majority* of class members -   were ***never exposed at all*** to its misleading campaign.   Indeed, it has not offered evidence that ***any*** member of the class of persons who purchased its cell phone service during the class period was not exposed to its pervasive Fewest Dropped Calls campaign. *Pfizer* gives it no help, even assuming the California Supreme Court does not render it un-citable in connection with the pending petition for review.

Defendant cites *Kaldenbach v. Mutual of Omaha Life Ins. Co.*, 178 Cal. App. 4th 830 (2009). That case merely found there was no abuse of discretion in denying class certification where the evidence suggested that the alleged class-wide *practice* of marketing "vanishing premium" policies in a misleading fashion did not in fact exist.   The appeals court implicitly agreed that the trial court's reliance on alleged complexities in establishing each absent class member's reliance on the representations and resulting injury was erroneous in light of *Tobacco II.   Kaldenbach* at 848.   But it found there were many *other* individual issues that went "not to the injury suffered by a purchaser, but to whether there was in fact an unfair **business practice** by Mutual." *Id.* (Emphasis added.) The *Kaldenbach* court, in examining the certification ruling, thus properly focused on *the defendant's conduct*, rather than the damages or injury to class members, consistent with *Tobacco II*.   Here,

1    Plaintiff has offered more than ample evidence that there was a practice, and his allegations that the

2    practice was deceptive and unfair must be accepted as true.[8]

3        Defendant also mentions *Hodes v. Van's Int'l Foods*, 2009 WL 2424214 (C.D. Cal. July 23,

4    2009) (Opp., 18:4-5.)   That case involved a variety of claims (including breach of warranty claims,

5    fraud claims and UCL/FAL claims) against four different food companies for selling frozen waffles

6    with fraudulent nutritional information.  The court denied class certification based on concerns about

7    the plaintiff's ability to identify the tens of thousands of consumers who had purchased such waffles

8    and, relatedly, because there were individual questions about "*which kind* of waffles they purchased,

9    *how many* they purchased, and whether the kinds they purchased contained false nutritional

10   information." *Hodes, supra* at *4. (Emphasis in original.)[9]  No such concerns exist here, since all the

11   advertising contained the "Fewest Dropped Calls" claim and the class members are identifiable from

12   Cingular's records.

13       *Sanchez v. Wal Mart Stores, Inc.*, 2009 WL 1514435 (E.D. Cal. May 28, 2009) is similarly

14   inapposite. It involved claims based on the allegedly misleading marketing of $20 strollers, which, as

---

[8]  Defendant also seeks to rely on *In re VIOXX Class Cases*, 180 Cal. App. 4th 116 (2009) (review denied Mar. 30, 2010). But that court also *agreed* that recovery under the UCL is allowed "without proof that the funds were lost as a result of actual reliance on defendant's deceptive conduct" (*id.* at 131) and "without proof of deception, reliance, and injury." *Id.*, 134. (*citing Tobacco II*). However, the case presented complex medical issues, and, critically, the plaintiffs proposed theory of valuing restitution that was necessarily individualized -- the difference in *value* between Vioxx and the *value* of a *proper generic comparator drug*.  The court found that the plaintiffs could not establish the existence, on a class basis, of a measurable amount of restitution, since the proposed valuation scheme depended on determining proper comparator drugs for people with different medical needs, histories and drug interactions.  Individual issues would predominate in doing so. *Id.*, at 136. ***While Defendant plainly dislikes Plaintiff's theory of restitutionary disgorgement and would prefer that Plaintiff was seeking damages, that does not mean that Plaintiff's theory presents the same individualized issues in this case.***

[9]  The other cases Defendant references briefly in footnote 23 are likewise inapposite and of little value in considering the claims here. *Endres v. Wells Fargo Bank*, 2009 WL 344204 (N.D. Cal. Feb. 6, 2008), for example, is factually distinguishable, based on the *evidence* that Wells Fargo offered (that the ads varied over time and location, that challenged oral statements varied by speaker and were "widely varying" and "non-standardized", etc.)  *Id.*, at *8. Moreover, the case pre-dated and thus did not discuss the import of *Tobacco II*. Similarly, *Mahfood v. QVC, Inc.*, 2008 WL 5381088 (C.D. Cal. Sept. 22, 2008) did not discuss *Tobacco II* or analyze the UCL claim separately, involved utterly distinguishable facts, and conclusions by the court that class members were required to establish they were actually misled and suffered damages due to having been misled. *Id.*, at *5. No such issues exist here.

alleged were unsafe and led some purchasers to return them.   *Sanchez* involves no discussion of *Tobacco II* (decided ten days earlier), and no discussion of what the district court believed were the elements of the claims at issue.   Indeed, the opinion does not even identify the claims that were at issue, other than to suggest that the plaintiffs were bringing warranty-based claims (relating to "merchantable quality" and fitness for "intended and reasonable uses") and were seeking "equitable relief, including restitution and injunctive relief . . . ."   *Id.*, at *1.   The court found that the plaintiff failed to meet the typicality and adequacy requirements, and then, with respect to predominance, focused on allegedly individualized issues relating to the class members' injuries, damages and reliance on the representations at issue (*id.*, at *2-4).   Whatever the merits of the *Sanchez* court's analysis based on the claims, facts and evidence that were before it, such issues are irrelevant to the claims brought by Plaintiff here.   Rather, as *Tobacco II* makes clear, the focus under the UCL/FAL is on the defendant's conduct, not the plaintiffs' injury, reliance or damages.   46 Cal. 4th at 320.[10]   Even Cingular's own cited authority – *Pfizer* – confirms that, at most, Plaintiff must show that the monies at issue "*may* have been acquired" as a result of the unfair/fraudulent business practice.   *Pfizer*, 182 Cal. App. 4th at 632-33; Bus. & Prof. Code § 17203.

In sum, Defendant's claims that individual inquiries exist as to Plaintiffs' UCL and FAL claims, regarding reliance, causation, etc., are simply wrong in light of *Tobacco II*.

### 4.   Breach of Contract Requires No Individualized Proof

Defendant contends that Plaintiff's contract claim fails to satisfy Fed.R.Civ.P 23(b)(3) because: (1) individual issues predominate; and (2) Plaintiff has not set forth a cognizable theory of damages. (Opp. at 25).   These arguments lack merit.

Defendant first argues that resolution of Plaintiff's contract claim will require individual inquiry as to each class member's expectations, their understanding of the contract, how many dropped calls they experienced and an exploration of what each class member would have experienced had they contracted with another carrier.   Not so.   Here, we have standard-form

---

[10]   Similarly, whatever the merit of the *Sanchez* court's conclusions about the defendant's "due process" rights to present "every available defense" to the claims at issue in that case (*id.* at *4), such concerns are misplaced here, because the "defenses" referenced in *Sanchez* are simply *not defenses* to any of the claims pleaded by Plaintiff.

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**
**Case No.: 5:07-cv-00411-JF**

1  contracts which were presented to Plaintiff and every class member.   Defendant does not argue

2  otherwise.   The contracts were drafted by Cingular and presented to class members on a take-it-or-

3  leave-it basis.  Plainly, Cingular intended there to be a common understanding and expectation from

4  the contract.   That common understanding and any expectations related thereto are subject to

5  determination under a reasonably prudent person standard – an inquiry that can easily and should

6  properly be done on a class-wide basis.  The final inquiry Defendant posits - "whether each class

7  member would have experienced fewer dropped calls with another wireless provider" - is irrelevant

8  to Cingular's liability for breach of contract, and also nonsensically asks the fact-finder to engage in a

9  speculative guessing game.  Cingular apparently thinks it can breach its contracts with impunity so

10  long as its customers cannot show they would have received better service elsewhere.   If only.

11       The Supreme Court has recognized that "contract law is not at its core diverse, nonuniform,

12  and confusing," a conclusion logically lending itself to certifying contract claims. *American Airlines*

13  *v. Wolens,* 513 U.S. 219, 223 (1995).  Indeed, breach of contract claims are routinely certified for

14  class treatment. *See, e.g., Westways World Travel*, 218 F.R.D. 223, 239.  The contracts at issue are

15  standard form contracts.  The alleged breach is an identical contractual promise made to all class

16  members that Cingular had the Fewest Dropped Calls when it did not.  When elements, such as these,

17  are objectively measurable (*i.e.*, subject to a reasonably prudent person standard) class certification is

18  appropriate. *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1093-94 (9th Cir. 2010)

19  (reversing denial of class certification in case based on contents of form documents which allegedly

20  were likely to deceive a reasonable consumer and thus did not require individualized inquiry);

21  *Lozano v. AT & T Wireless Services, Inc.*, 504 F.3d 718, 737 (9th Cir. 2007) (same); *Vathana v.*

22  *EverBank,* 2010 U.S. Dist. LEXIS 35665, 12-14 (N.D. Cal. Mar. 15, 2010) (similar).

23       With respect to damages, the final element of a breach of contract claim, Defendant argues

24  that (1) disgorgement is not an appropriate measure of damages; and (2) plaintiff has otherwise failed

25  to present a cognizable theory damages because it is impossible to measure the difference between

26  what consumers were promised and what they received. Again, these arguments lack merit.

27       As detailed in the French Report, "[t]he basis of Plaintiff's claim for damages ... is to recover

28  the profits that Cingular derived from California subscribers who initiated or renewed Cingular

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**
Case No.:  5:07-cv-00411-JF

1    wireless service agreements during the Class Period." French Report at ¶76.  Separate from the

2    breach of contract claim, Plaintiff also seek relief for unjust enrichment (Complaint at ¶¶76-78).  The

3    Ninth Circuit has held that "under California law, a defendant's unjust enrichment can satisfy the

4    damages element of a breach of contract claim, such that disgorgement is a proper remedy." *Foster*

5    *Poultry Farms, Inc. v. SunTrust Bank*, 2010 U.S. App. LEXIS 8827 (9th Cir. Cal. Apr. 26, 2010),

6    *citing Ajaxo, Inc. v. E\*Trade Group, Inc.*, 37 Cal. Rptr. 3d 221 at 247-49 (2005) (disgorgement

7    appropriate where defendant was unjustly enriched by breaching a non-disclosure agreement); *Snepp*

8    *v. United States*, 444 U.S. 507, 511-15, 100 S. Ct. 763, 62 L. Ed. 2d 704 (1980) (per curiam)

9    (constructive trust on profits from a book was an appropriate remedy for breach of a contract

10   requiring author to submit his material for clearance by the Central Intelligence Agency before

11   publication, where the government's harm from the breach was unquantifiable, but author's unjust

12   gains were the result of the breach).[11]

13       While Defendant assails Plaintiff's underlying theory of damages, it does not, because it

14   cannot, contend that resolution of the theory is somehow different for each class member.  Indeed, the

15   theory of determining damages will be the exact same for each member of the class making this issue

16   common to the class and clearly certifiable.  That the ultimate *amount* each class member would be

17   entitled to under this theory may differ is also of no consequence in analyzing the viability of class

18   certification.  *Yokoyama*, 594 F.3d at 1089.

19       **5.    Quasi-Contract/Unjust Enrichment Requires No Individualized Proof**

20       With respect to Plaintiff's sixth claim for quasi-contract/unjust enrichment, Defendant argues

21   that: (1) determining whether a valid contract existed would be an individualized inquiry; (2) the

22   amount of unjust enrichment differs for each class member thereby necessitating individualized

23   inquiry; and (3) allowing pursuit of such relief would impermissibly allow Plaintiff to circumvent the

24   "damage limitations of the UCL." (Opp. at 27-28).  These arguments fail as shown below.

25

26   [11]  Defendant's reliance on *Watson Laboratories Inc v. Rhone-Poulenc Rorer*, 2001 WL 1673258
     (C.D. Cal. 2001) is misplaced.  In *Watson,* the court on a motion in limine determined that

27   disgorgement was not an appropriate remedy for Plaintiff's breach of contract because it would result
     in an inequity.  Notably, the court did not preclude Plaintiff from recovering compensatory damages.

28   The court  further recognized that its holding was unique to facts of the case, recognizing that
     "equitable remedies sometimes can be awarded for breach of contract" at \*4.

PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION
Case No.: 5:07-cv-00411-JF

First, Plaintiff pled his sixth claim as an alternative to breach of contract. Such alternative pleading is entirely proper. *PAE Government Services, Inc. v. MPRI, Inc.*, 514 F.3d 856, 858 (9th Cir. 2007) ("we allow pleadings in the alternative-even if the alternatives are mutually exclusive."); *see also* Fed. R. Civ. Proc. 8(d)(2), (3). Defendant asserts determining whether a valid contract existed for each class member would require a case-by-case analysis. (Opp at 27). This argument makes little sense. Plaintiff and each class member received a standard form contract with boilerplate provisions offered on a take-it-or-leave-it basis. No one has sued for common law fraud or mistake, so Cingular's suggestions about those issues and the possibility of individual rescissions are speculative and unsupported. By signing, Plaintiff and class members were obligated to (and did) pay fees. If the contract suffered from any infirmity that could render Plaintiff's contract claim moot, then it would apply equally to every class member.[12]

Second, as discussed in the context of Plaintiff's breach of contract claim, the ultimate amount of money each class member might recover if it were determined that Cingular unjustly enriched itself by means of its conduct might or might not be different, but such differences, if any, would not undermine class treatment. *Yokoyama*, 594 F.3d at 1089.

Finally, Plaintiff recognizes that restitution under the UCL is an equitable remedy and to the extent he seeks disgorgement under this claim, it has been limited to restitutionary disgorgement. Indeed, as the French Report clearly states, "[t]he basis of Plaintiff's claim for damages in this matter is to recover the profits that Cingular <u>derived from California subscribers</u> who initiated or renewed Cingular wireless service agreements during the Class Period. French Dec. ¶76 (emphasis added).

Moreover, even if the disgorgement that Plaintiff sought was not restitutionary in nature, it too would be a proper basis of remuneration because it is only under the UCL that disgorgement must be restitutionary in nature. Defendant's reliance on *Peterson v. Cellco Partnership*, 164 Cal. App.

---

[12] Defendant's reliance on *Deitz v. Comcast Corp.*, 2007 U.S. Dist. LEXIS 53188 (2007), is misplaced. There, plaintiff on an unjust enrichment claim sought to certify a class of all subscribers who were incorrectly charged. But uniformity was lacking in *Deitz* because the defendant had not issued standard form contracts to all class members. *Id* at *23. Many class members also had different cable services, some of which allowed the cable company to levy charges for converter boxes, while others did not. The individualized inquiries necessitated in *Deitz* are simply not present here.

PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION
Case No.: 5:07-cv-00411-JF

18

4th 1583 (Cal. App. 4th Dist. 2008) is misplaced.  In *Peterson* the plaintiffs predicated their UCL claims solely on the violation of the Insurance Code, which itself did not confer a private right of action.  The Court dismissed the UCL claims because the plaintiff was unable to demonstrate a monetary injury to satisfy the *standing* requirement.  The plaintiff then attempted to resuscitate the case by pleading the same facts as an unjust enrichment claim.  The Court held there was no unjust enrichment because plaintiffs had received the benefit of their bargain (insurance).  The court also noted that it would be improper to adjudicate a UCL action (for which the plaintiffs did not have standing) under the guise of unjust enrichment.  *Peterson,*, 164 Cal. App. 4th at 1596.  The *Peterson* facts are inapposite here, where Plaintiff both has standing to pursue a UCL claim and has alleged other UCL-independent claims under which relief is not limited to restitutionary disgorgement.

**D.   A Class Action is the Sole Efficient Method for the Management of this Litigation**

Cingular's argument that a class action is not superior because it would not be manageable, is, once again, premised on an incorrect understanding of California law.  Ironically, its own argument - rather than suggesting a lack of superiority - if anything, suggests just the opposite.

First, Cingular misrepresents California law in suggesting that Plaintiff failed to meet his burden in not submitting a formal "trial plan." (Opp. at 28).  Plaintiff's moving papers provide a detailed analysis of each of the elements of the class claims, and the proof by which these elements may be established. (Plft. Mem. at 17-23).  In this context, a trial plan is <u>not</u> required. *Zinser v. Accufix Research Institute, Inc.* 253 F.3d 1180, 1189 (9th Cir. 2001) (trial plan is only required where certification is sought of a nationwide class for which the law of forty-eight states potentially applies). [13]

Defendant ineffectually argues that a class action is unmanageable because there are issues that will have to be tried separately for each class member.  Cingular's examples of such issues

---

[13]   *Ruiz,* a 1998 decision based upon violations of the law of Puerto Rico, is inapposite. The class there was extremely diverse - ranging from smokers with serious illnesses to those who had merely smoked a few cigarettes over the course of their lives. *Barreras Ruiz v. Am. Tobacco Co.,* 180 F.R.D. 194, 197-199 (D.P.R. 1998).  The Court's concern in regards to a trial plan was based on the need to resolve the likely intra-class conflicts. *Daniel v. Am. Bd. of Emergency Med.*, 269 F. Supp. 2d 159, 202 (W.D.N.Y. 2003).

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**
Case No.: 5:07-cv-00411-JF

include the need for the testimony of expert witnesses, the large number of documents, and "significant liability issues." (Def Mem at 29). Each of these issues can properly be resolved class-wide. Likewise, the Court can reject its oft-repeated argument regarding the purported need to conduct mini-trials to determine what individual class members saw and/or thought prior to contracting with Cingular, as that argument is premised on a misunderstanding of California law regarding the purported reliance requirements at issue here. *See* Section C., *supra*.

Last, Defendant - after having its arbitration clause deemed in violation of California law and unenforceable by both this Court and the 9th Circuit - continues arguing consumers would be best served arbitrating their claims.[14] First, superiority under Rule 23 seeks to determine whether there are reasonable litigation alternatives to class treatment. The notion that tens of thousands of class members could instead individually arbitrate the claims at issue here is silly. Defendant's reference to *Laster* is unavailing. The *Laster* court held a similar arbitration provision unenforceable explaining that an arbitration provision which permitted punitive damages was insufficient in addressing the "overarching policy concern of deterring corporate wrongdoing... One, or even several, such damage awards would be an insufficient substitute for the deterrent effect caused by the threat of large damage awards that frequently accompany class action lawsuits." *Laster*, 2008 U.S. District LEXIS 103712 *42 – 43.

## III.    CONCLUSION

Plaintiff respectfully requests his Motion for Class Certification be granted.

Dated: May 21, 2010

                                **STEMBER FEINSTEIN DOYLE**
                                **PAYNE & CORDES, LLC**

                                By:   s/Joseph N. Kravec, Jr.
                                     Joseph N. Kravec, Jr.

---

[14] Defendant confuses the requirement of superiority under Rule 23(b)(3) with the feasibility of an individual lawsuit by one plaintiff. The superiority analysis requires "a comparable evaluation of other procedures" for resolving <u>all</u> the claims against the defendant. *Local Joint Executive Bd. of Culinary/Bartenders Trust Fund v. Las Vegas Sands, Inc.* 244 F.3d 1152, 1163 (9th Cir. 2001). In other words, superiority does not depend solely on whether a plaintiff has sufficient <u>incentive</u> for bringing an individual lawsuit. The crux of the superiority question is whether a class action is preferable to <u>multiple lawsuits</u> from the standpoint of litigation efficiency. *Valentino v. Carter-Wallace*, 97 F.3d 1227, 1234-35 (9th Cir. 1996).

Allegheny Building, 17th Floor
429 Forbes Avenue
Pittsburgh, PA 15219
Telephone: (412) 281-8400
Facsimile: (412) 281-1007
Email: jkravec@stemberfeinstein.com

Michael D. Braun, Esquire (167416)
BRAUN LAW GROUP, P.C.
10680 West Pico Boulevard, Suite 280
Los Angeles, CA 90064
Telephone: (310) 836-6000
Facsimile: (310) 836-6010
Email: service@braunlawgroup.com

Janet Lindner Spielberg, Esquire (221926)
LAW OFFICE OF JANET LINDNER
   SPIELBERG
12400 Wilshire Boulevard, Suite 400
Los Angeles, CA 90025
Telephone: (310) 392-8801
Facsimile: (310) 278-5938
Email: jlspielberg@jlslp.com

J. Mark Moore, Esquire (180473)
Ira Spiro, Esquire (67641)
SPIRO MOSS, LLP
11377 West Olympic Boulevard, Fifth Floor
Los Angeles, CA 90064-1683
Telephone: (310) 235-2468
Facsimile: (310) 235-2456
Email: mark@spiromoss.com;
ira@spiromoss.com

Wyatt A. Lison, Esquire
SPECTER SPECTER EVANS
   & MANOGUE, P.C.
The 26th Floor Koppers Building
Pittsburgh, PA 15219
Telephone: (412) 642-2300
Facsimile: (412) 642-2309
Email: wlison@ssem.com

***ATTORNEYS FOR PLAINTIFF***

1                                   **PROOF OF SERVICE**

2    STATE OF PENNSYLVANIA              )
                                        )  ss.:
3    COUNTY OF ALLEGHENY               )

4
            I am employed in the county of Allegheny, Commonwealth of Pennsylvania, I am over the
5    age of 18 and not a party to the within action; my business address is Allegheny Building, 17th Floor,
     429 Forbes Avenue, Pittsburgh, Pennsylvania 15219.
6
7           On May 21, 2010, using the Northern District of California's Electronic Case Filing System,
     with the ECF ID registered to Joseph N. Kravec, Jr., I filed and served the document(s) described as:
8
9    **PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

10          The ECF System is designed to automatically generate an e-mail message to all parties in the
     case, which constitutes service. According to the ECF/PACER system, for this case, the parties
11   served are as follows:

12   Ira Spiro, Esq.                         ira@spiromoss.com
                                             jeanette@spiromoss.com
13   J. Mark Moore, Esq.                     mark@spiromoss.com
     Wyatt A. Lison, Esq.                    wlison@ssem.com
14   Janet Lindner Spielberg, Esq.           jlspielberg@jlslp.com
15   Michael D. Braun, Esq.                  service@braunlawgroup.com

16   **Attorneys for Plaintiff**

17   David L. Balser, Esq.                   dbalser@mckennalong.com
                                             kwade@mckennalong.com
18   Nathan L. Garroway, Esq.                ngarroway@mckennalong.com
                                             rfowler@mckennalong.com
19   Felicia Yi-Wen Feng, Esq.               ffeng@mckennalong.com
                                             gparonelli@mckennalong.com
20   Donald M. Falk, Esq.                    dfalk@mayerbrown.com
21                                           ksurzynski@mayerbrown.com

22   **Attorneys for Defendant**

23          I declare that I am an attorney for Plaintiff admitted *pro hac vice* in this action.

24          I further declare under penalty of perjury under the laws of the United States that the above is
25   true and correct.

26          Executed on May 21, 2010, at Pittsburgh, Pennsylvania 15219.

27                                                   s/Joseph N. Kravec, Jr.
                                                     Joseph N. Kravec, Jr.
28

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**
Case No.: 5:07-cv-00411-JF