CONTAINS CONFIDENTIAL OR HIGHLY CONFIDENTIAL INFORMATION

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN C. KALTWASSER, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CINGULAR WIRELESS LLC, a Delaware corporation<br><br>Defendant. | Case No. 5:07-cv-00411-JF |

**SECOND DECLARATION**

**OF**

**GARY L. FRENCH, Ph.D.**

**August 3, 2011**

Gary L. French, being duly sworn, deposes and says:

1. I am Gary L. French, an economist and principal consultant to Nathan Associates Inc. I have been associated with Nathan Associates and engaged in litigation expert work for over 30 years. My expert assignments have occurred in a variety of cases involving antitrust, bankruptcy, breach of contract, fraud and misrepresentation, false advertising, and other claims. On February 23, 2010, I submitted an initial declaration in this matter. Appendices to that declaration contain my resume, a list of cases in which I have testified in recent years, and a list of the documents and sources of information I have reviewed and considered in this case.

2. Until this year, I served as the manager of Nathan Associates' litigation practice for 15 years. Both my roles as a testifying expert and as the litigation practice manager have provided me with substantial experience and expertise concerning the economic, financial, and statistical analysis of liability and damage issues in complex litigation, as well as the costs of such analysis. Not only do I know of the costs of expert assistance in the cases in which I have been the testifying expert, but as the practice manager for so long I am also familiar with costs of expert services in many cases in which others at or affiliated with Nathan Associates have been the testifying experts.

3. Plaintiff's counsel have requested that I provide an expert opinion of the likely cost of the expert analysis and testimony an individual plaintiff would incur to make and prosecute the same claims the proposed class in this case makes, and then contrast that cost with the economic benefit an individual plaintiff might obtain in such a case. Doing so will then reveal the economic feasibility of bringing the case on an individual, as opposed to a class, basis.

## The Cost of Expert Services

4. Plaintiff's counsel has been billed a total of $86,227.35 thus far for the expert services of Nathan Associates and me in this case. In addition to consultation with counsel, this sum has covered the research, analysis, and writing culminating in my February 23, 2010 declaration, as well as the preparation for and delivery of my deposition testimony on March 30, 2010. While some of our expert services to date have related exclusively to the commonality of liability and damage evidence and other class certification issues, the bulk of our work has involved the initial

analysis of the validity of Cingular Wireless' dropped call claims. Consequently, at least $65,000 of the expert services provided to plaintiff's counsel related to our initial economic and statistical analysis of Cingular's dropped call claims and the underlying drive tests performed by Telephia, Inc. and Global Wireless Solutions (GWS).

5. The initial analysis of GWS and Telephia data and Cingular's fewest dropped call claims was included in my first declaration, given the class certification requirements indicated by *Hydrogen Peroxide*.[1] However, this analysis was not as thorough and complete as it likely would be at the merits stage of the case. For example, actual drive test data by call have not yet been made available. For this reason, the analysis in my first declaration relied on documents summarizing drive test results produced by Cingular. These summary metrics did not cover all 290 local markets tested by GWS and Telephia.[2]

6. An expert report prepared for an individual plaintiff in a non-class lawsuit would be a merits report, and would need to be more comprehensive and complete than my declaration at the class certification stage of the current case. Thus, it would cost more. While my initial declaration and deposition cost plaintiffs approximately $86,000 in professional staff time and related expenses, the cost of a more comprehensive merits report of an expert together with the expert's deposition in a case brought by an individual plaintiff would cost at least $110,000 to $130,000, based on my experience and Nathan Associates' hourly billing rates for professional staff. The bulk of these fees $90,000 to $110,000, would be for a detailed and comprehensive analysis of GWS and Telephia data to address the dropped call claims made and advertised by Cingular. The remaining $20,000 would involve the estimation of the individual plaintiff's damages or restitution.

7. In an individual case, defendant Cingular (now AT&T) would undoubtedly have another expert file a report rebutting the plaintiff's expert's analysis and conclusions. Then a reply report by plaintiff's expert would likely be allowed by the court and required by plaintiff. Again, in my

---

[1] United States District Court for the Eastern District of Pennsylvania, *In re: Hydrogen Peroxide Antitrust Litigation*, Docket No. 2:05 CV 00666 SD, MDL Docket No. 1682.
[2] The most comprehensive of such documents included 173 local markets.

experience, such a reply report would cost in the $50,000 to $70,000 range depending upon how much empirical work would be done.

8. After the reply report, the plaintiff's expert might be deposed again. But even without a second deposition, the plaintiff's expert would have to prepare for trial and testify at trial if the individual plaintiff case did not settle or otherwise end prior to trial. The trial related preparation, including trial exhibits, and trial testimony would cost between $30,000 and $50,000.

9. In the interim between the plaintiff's expert's submission of a reply merits report and the start of preparation for a trial, the plaintiff's expert could be asked to help respond to a motion *in limine* by defendant to exclude the testimony of the plaintiff's expert or to defendant's motion for summary judgment. Such assistance could vary from just consultation with and advice to plaintiff's counsel to additional expert reports attached to plaintiff's responses to such motions by defendants, which would further increase expert costs.

10. However, even if there were no motions *in limine* or for summary judgment, or if expert assistance were not needed for plaintiff to respond to such motions, the total cost to plaintiff for expert assistance in a non-class case would be substantial. Based on the above, it is my opinion that expert costs limited to an initial merits report, a deposition, a reply report, and trial preparation and testimony for a plaintiff in a non-class lawsuit making the same claims against defendant as in the current class action would range from at least $190,000 to as much as $250,000, and possibly more.

### Likely Damages or Restitution
### To an Individual Plaintiff

11. An individual plaintiff would presumably claim that he or she would not have subscribed to wireless telephone service from Cingular in the absence of Cingular's allegedly false and misleading fewest dropped calls advertising and promotion. The remedies that might be available to an individual plaintiff are damages, restitution, and/or restitutionary disgorgement. Damages quantify the harm to the plaintiff stemming from the allegedly unlawful conduct. Restitution would consist of the return of all the money plaintiff paid to defendant for the product

or service associated with the alleged wrongdoing. Restitutionary disgorgement refers to the disgorgement of the gain or profit defendant made on the sale of the product or service to the plaintiff.

12. In an individual case with the allegedly false and misleading dropped calls claims, damages would equal the amount the plaintiff subscriber paid to Cingular provided the plaintiff received no value from Cingular service. Otherwise such value would have to be subtracted from plaintiff's expenditures to obtain plaintiff's damages. Restitution on the other hand would simply equal the expenditures plaintiff made for Cingular's service and the wireless telephone obtained from Cingular. Restitutionary disgorgement would equal the revenues Cingular received from the plaintiff less any costs associated with the provision of a phone and service to plaintiff, or in essence the profit Cingular made from the sale of the phone and service to the plaintiff.

13. With these definitions of the possible remedies, it is clear that restitution would provide the greatest benefit to the plaintiff. Damages would be as large as restitution only if plaintiff received no value from Cingular service. Similarly, restitutionary disgorgement would be as large as restitution only if there were no variable or incremental costs to Cingular to provide service to the plaintiff. Thus, while the damages and restitutionary disgorgement remedies could be as large as simple restitution, the latter is at least as much as the other and likely would provide the greatest benefit to the plaintiff.

14. An example of the revenues an individual plaintiff provided to Cingular, or the expenditures a plaintiff made for Cingular service, can be determined using facts and information for named plaintiff Jonathan Kaltwasser. Mr. Kaltwasser's wireless service agreement with Cingular was entered into in the summer of 2006.[3] The agreement covered two wireless telephones which required an $18.00 upgrade fee for each. The monthly service fee was $50.00 for the first phone and $9.99 for the second for a total monthly service charge of $59.99. This charge provided for unlimited and free night-time and weekend use and calls between the two wireless phones, as well as 850 minutes of anytime/daytime use. After 850 minutes of daytime

---

[3] See Plaintiff 000255-8 and 000277-8.

use in a month, there were additional charges of 35 cents a minute for airtime use, as well as 10 cents for each text message. There were also government fees and taxes levied each month. The term of the service agreement was two years, and Mr. Kaltwasser terminated service at the end of the two years.

15. Four available monthly bills sent by Cingular to Mr. Kaltwasser for his first four months of service contain monthly totals excluding phone upgrades of $69.71, $71.42, $70.31, and $73.37.[4] Including $36.00 for the two phone upgrades and assuming the monthly bills for the remaining 20 months would not average more than $75.00 a month. The total amount paid by Mr. Kaltwasser and received by Cingular over the two years of service is estimated to be $1,820.81.

16. Another subscriber with a spouse and two or three teenagers would likely have been on a family plan with four or five phones. However, given the two-year cost to Mr. Kaltwassser for two phones, this other subscriber's family plan would likely have cost around $4,000 for two years. Of course, the cost would be less than Mr. Kaltwasser's for a single person with only one phone, or for a subscriber with a one-year service agreement who terminated at the end of the year.

17. The revenues received by Cingular from the various post-paid subscribers in the proposed class might vary from about $720 for a subscriber with a single phone and only a one-year agreement and length of service to about $4,000 for a subscriber with a multi-phone plan with a two-year agreement and length of service.[5] The estimated revenue Cingular received from Mr. Kaltwasser, $1,820.81, would therefore seem to be typical for Cingular subscribers during the class period.

---

[4] See Plaintiff 000289-96.
[5] Post-paid subscribers enter into a service agreement and pay each month for service already received. Pre-paid subscribers simply purchase a fixed amount of airtime in advance of using the airtime. Revenues per subscriber are typically less for pre-paid subscribers than post-paid subscribers.

## Conclusion

18. From the above, the typical revenue per class subscriber received by Cingular would likely have been near the estimated $1,820.81 Cingular obtained from Mr. Kaltwasser, while the maximum revenue from any class subscriber was likely around $4,000. These typical and maximum revenue figures are also indicative of the typical and maximum benefit or restitution an individual plaintiff might recover from prosecuting a non-class lawsuit against Cingular.

19. For the purpose of assessing the economic merit of an individual plaintiff bringing a lawsuit against Cingular, the largest conceivable recovery by an individual plaintiff could not be much more than about $4,000, which is more than twice the expenditures made by Mr. Kaltwasser for Cingular service and a phone. However, recovery by an individual plaintiff of $4,000 would be tiny in comparison to the expert costs of $190,000 to $250,000 the plaintiff would incur prosecuting an individual case through trial. And this large range does not include attorneys' fees, court fees, or any other litigation expenses beyond expert costs. Consequently, it would be economically irrational to incur such huge costs in the hope of receiving no more than about $4,000 in restitution. As a practical matter then, an individual, non-class lawsuit against Cingular making the same claims as those in the current class action would not be economically viable.

I declare under penalty of perjury on this ___3rd___ day of August 2011 that the foregoing is true and correct to the best of my knowledge and ability.

_____
Gary L. French